## Malcolm McPhail v. Etta Trovillo.

1. BREACH OF PROMISE—*Burden of Proof.*—In an action for a breach of a promise of marriage, the burden of proving such promise by the preponderance of evidence is upon the plaintiff.

2. JURY—*Judges of the Credibility of Witnesses.*—It is true in law that the jury are the sole judges of the credibility of witnesses and of the weight to be given to their testimony, but if this proposition is to be taken without limitation, the Appellate Court can never find a fact dif-

ferent from what the jury have, but must let their verdict stand, whether consistent with the weight of evidence or not, and no matter to what extent they may have disregarded, from prejudice, caprice or otherwise, competent and unimpeached testimony.

**Assumpsit.**—Breach of promise of marriage. Error to the Circuit Court of Rock Island County; the Hon. HIRAM BIGELOW, Judge, presiding. Heard in this court at the December term, 1895. Reversed, with a finding of facts. Opinion filed June 1, 1896.

JACKSON & HURST, attorneys for plaintiff in error.

J. M. BEARDSLEY and WILLIAM McENIRY, attorneys for defendant in error.

MR. JUSTICE CRABTREE DELIVERED THE OPINION OF THE COURT.

This was an action for breach of promise of marriage. There was a trial by jury, verdict of $1,250, motion for new trial overruled, the judgment on verdict against plaintiff in error for $1,250 damages and for costs. Various errors are assigned upon the record calling in question the propriety of the rulings in the court below, but the principal point relied upon for a reversal is, that the verdict is contrary to the weight of the evidence, and that question we will consider first.

The facts, as we gather them from a very careful examination of the evidence, are substantially as follows: At the time of the alleged promise to marry, defendant in error was a dressmaker, living at Reynolds, in Rock Island county, and occupying rooms over the store in which plaintiff in error, and his partner, William McIntyre, were carrying on business in general merchandise. She was then thirty-seven years old; had been married at the age of sixteen, or twenty-one years before her acquaintance with McPhail. She had lived with her husband some ten years, had one child, a boy, about fourteen years old at the time of the trial, and left her husband and boy in Kansas, returning to Illinois, where she procured a divorce from her husband, who had died since the divorce. Her boy has never lived

with her since she left Kansas, but resides with the man who was his father's partner, and she has only seen him once since she returned to Illinois.

The plaintiff in error, McPhail, is a single man, the junior partner of the firm of McIntyre & McPhail, general merchants in said town of Reynolds, and he is just the same age as defendant in error. The parties had known each other prior to December, 1893, for several years, but up to that time the acquaintance seems to have been but casual. Defendant in error swears that on a certain evening in December, 1893, she met McPhail on the street and after some unimportant conversation they separated, she returning to her rooms, where, a few minutes afterward, McPhail came to visit her. He stayed there until half past ten o'clock, and, she says, "when he went to go home he left very affectionately." On her cross-examination she admitted sitting in his lap and allowing him to kiss her on the occasion of this first visit. She testifies that McPhail continued calling upon her until the latter part of the following February (1894). That he had frequently tried to take liberties with her person, had placed his hands upon her limbs, and took hold of her ankle, but, as she says, "no higher." That he would have done more if he could, but she wouldn't allow it. That he then promised to marry her, and she gave way to him, illicit relations between them commencing either the night she says he promised to marry her, or very shortly afterward, and continuing until the following September. She admitted that McPhail's visits to her were in secret, and in order that his coming to see her should not be known by others, a private way to get to her rooms was arranged, by taking off boards in the partition between the store and the back stairway to her apartments, so that when McPhail wanted to go and see her, he would crawl through the hole made by taking the boards off, while she waited with a chair on the opposite side to help him down. This appears by her own testimony, but she says it was because McPhail did not want their engagement known in Reynolds, on account of the sensation it would make.

So far as the alleged promise of marriage is concerned, plaintiff's case rests solely and entirely upon her own testimony. Not a single witness was called to corroborate her upon any fact or circumstance bearing upon that question. Witnesses were called by her as to her general reputation for chastity, but that testimony had no bearing upon the real question at issue, namely, whether or not there ever was a promise on the part of McPhail to marry her. That he ever made such promise, McPhail most positively and emphatically denies. The illicit intercourse with her he admits, but insists that it was by her own free will, and even by her own seeking and invitation, if not by words, yet by acts which amounted to the same thing. He swears that prior to the commencement of these illicit relations the sub- ject of marriage between them was never mentioned or re- ferred to; that the first conversation that they ever had about marriage was the last time he called upon her, in August, of 1894, when she said "she would not do this any more" unless he would marry her; that he then told her "all right, that settled it," and she said "all right."

The burden of proving the promise of marriage being upon the plaintiff, and her testimony being directly contra- dicted by the defendant, it can not be said she has proven her case by a preponderance of the evidence, provided the witnesses are equally entitled to credit for truthfulness. But we think there is some corroboration of McPhail, not only in the testimony of witnesses, but in the circumstances and probabilities surrounding the whole intimacy of the parties, as shown by the evidence.

The witness W. J. McIntyre, testifies to a conversation he had with defendant in error at the depot in Rock Island, on February 11, 1895, in which she told the witness she was "darned mad." And, among other things, she said there was "a clique in Reynolds trying to run her out of town, and that Mack (meaning McPhail) was in it." She said she would be even with him. "I says, 'What are you going to do?' She says, 'I am going to sue him.' 'Why,' I says, 'for the Lord's sake, what are you going to sue him

for?' She says, 'For breach of promise.' I says, 'Do
you want to stand up there and tell me that McPhail ever
asked you to marry him?' and she says, 'Well, no, but then
he led me to believe he was.'" And after some similar con-
versation, the witness asked her what had been done, and
in what way he had led her to believe he would marry her,
and her answer was, "Well, darn him, what did he come
up there for?" And on cross-examination the witness said,
"When I asked her if Mack had agreed to marry her, she
said that he had not." The plaintiff was not recalled to
contradict this testimony, but in her cross-examination,
when on the stand in her own behalf, she testified to having
a conversation with Mr. McIntyre at the time and place
referred to, but she swears that she then told McIntyre that
McPhail had promised to marry her, and if he didn't do
it she was going to sue him. The witness McIntyre is in
no wise interested in this suit, except as he may have a
friendly feeling for his partner, and if his version of the
conversation is correct, the plaintiff did not then claim that
McPhail had in fact promised to marry her, but only that
he led her to believe he was going to do so. The witness
Frank Keim testifies to a conversation with defendant in
error, in August, 1894, at a time when she claims this mar-
riage contract was in force, if it ever was, in which, if he
tells the truth, she made an indecent remark in reference to
the idea of her marrying McPhail, which was entirely in-
consistent with the claim she now makes, that she was
under an engagement to marry him, and which she desired
to have carried out. We are asked to disbelieve this testi-
mony, because the jury could not have given it much weight,
and it is said they are the sole judges of the credibility of
the witnesses, and of the weight to be given to their testi-
mony, and in law this is true; but if this proposition is to be
taken without limitation, then an appellate court can never
find a fact differently from what the jury have found, but
must always let their verdict stand, whether sustained by
the weight of the evidence or not, and no matter to what
extent they may have disregarded, from prejudice, caprice

McPhail v. Trovillo.

or otherwise, competent and unimpeached testimony. But ever since courts have had an existence in this State, trial judges, as well as the higher courts, have been constantly setting aside verdicts of juries, because not supported by the evidence, and, in a proper case, it is clearly not only their right, but their duty to do so, in order that justice may be done. It is argued by counsel for defendant in error, that it is impossible a woman of such high moral instincts, as he claims the evidence shows her to be, could have used the language attributed to her by the witness Keim.

We have no disposition to indulge in any harsh criticism of her conduct, as shown by the record in this case, but we think the less that is said about her high moral instincts the better. Her own testimony as to her association with plaintiff in error, and her admissions as to what took place between her and the witness Dr. Werner, when he called upon her, do not indicate that she was a woman of extremely refined notions as to the proper distance to be maintained between virtuous people of opposite sexes. There is no pretense that Dr. Werner was paying any particular attention to her, and yet she admits that when he casually called at her rooms, and they were then alone together, she was " cutting up " with him, putting on his overcoat, that he pushed her over on to the bed, and tried to put his hand on her person, and can't say positively whether she sat in his lap or not. We hardly think this conduct indicates that refined delicacy or those " high moral instincts " which it is insisted the defendant in error possessed, and which, she claims, have been so grossly outraged by the plaintiff in error. But if we take the testimony of Dr. Werner as being true, she allowed him, on the occasion when she admits he was at her rooms, to take all the liberties with her that he chose, and in effect seemed to chide him, because he did not seek to have sexual intercourse with her. It is unnecessary to discuss or detail his entire testimony, but if true, it certainly places defendant in error in anything but an enviable light, as a woman of refined and pure mind. We are asked also to disregard the

testimony of this witness as unworthy of belief, but we see no reason why we should take the uncorroborated denial of defendant in error, as against the testimony of McIntyre, Keim, Werner and plaintiff in error, who all contradicted her upon important facts in the case. It is true we have not the advantage of having seen the witnesses, and can only judge of them from what appears in the record, but that is true of every case which comes up for review, and unless something appears to discredit the testimony of a number of witnesses, as against one, we can not say that the one shall be believed as against the number.

So far as the sworn testimony is concerned, we think the preponderance of the evidence was with the plaintiff in error, rather than with the defendant in error, upon whom the burden of proof lay. But in this case there is an entire absence of any of those facts or circumstances which are the usual concomitants of an engagement to marry. No one but themselves ever knew, while their intimacy was going on, that they were seeing each other at all, or having any association whatever. All their meetings were secret and clandestine, pains being taken by McPhail, with the active participation and co-operation of defendant in error, to allow him access to her rooms without the knowledge of the outside world. They were never seen out riding or walking together, never went to entertainments or to church in each other's company, and in fact their conduct, during all the six or seven months of their intimacy, seems far more consistent with the idea of a guilty *liaison*, as claimed by McPhail, than that of an engagement to marry, as contended for by defendant in error. It must be remembered that she was a woman of mature age, and not a young, unsophisticated girl. She had been a married woman and was a mother. She knew what every advance, or approach toward impropriety with the other sex meant, and would probably lead to, if not repelled at the outset. And yet, at his first visit, she allowed liberties and caresses from McPhail, by sitting in his lap and permitting him to kiss and fondle her, which were liable to inflame the passions and lead to

the results which followed. Had she been a woman of "high moral instincts" she would not have allowed conduct which would very naturally lead to indecent proposals, but if such proposals were made, a virtuously minded woman would have instantly repelled them as an insult, and not even a promise of marriage at some time in the future would have induced her to submit, at once, to illicit intercourse, and continue the same for six or seven months, without an intimation to a living soul that she expected the plaintiff in error to marry her. It seems to us that her testimony, under all the circumstances of the case, is not more worthy of credence than that of McPhail, and without discussing the question further, we hold that the verdict was not supported by the evidence, and therefore the court erred in not granting the motion for a new trial.

For the errors indicated the judgment will be reversed.

FINDING OF FACTS TO BE MADE A PART OF THE JUDGMENT.

We find the facts in the above cause differently from those found in the court below, as follows:

1. We find that no promise to marry appellee was ever made by appellant to her in manner and form as charged in the declaration.